# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DONALD C. ANDERSON, | ) | CASE NO. 1:16CV01086 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Donald C. Anderson ("Plaintiff"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, it is recommended that the

Commissioner's final decision be AFFIRMED.

---

[1]    On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of
Social Security.

1

# I.  PROCEDURAL HISTORY

On January 19, 2013, Plaintiff filed applications for POD and DIB alleging a disability onset date of December 3, 2008.  (Transcript ("Tr.") 183-86).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 132-35, 141-43, 146-47).

On January 28, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 35-83).  On March 2, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 13-34).  The ALJ' s decision became final on March 7, 2016, when the Appeals Council declined further review. (Tr. 1-4).

On May 5, 2016, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 19). Plaintiff asserts the following assignments of error:

> (1)  Whether the ALJ erred when she determined that Plaintiff's condition did not meet Listing 1.02(A); and
>
> (2)  Whether the ALJ erred in making a credibility assessment of Plaintiff

(Doc. No. 1).

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Plaintiff was born November 3, 1973 and was forty-one years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 26).  He left school after completing the eighth grade, and he is able to communicate in English.

2

(*Id.*)  He has past relevant work as a dump truck driver, tractor trailer driver, and cement mason. (Tr. 70-71).

**B.    Medical Evidence**

    **1.    Physical Impairments**

On September 10, 2007, after an accident at work, Plaintiff presented with a fracture to his left ankle.  (Tr. 345-36).  Plaintiff followed up with orthopedic consultant Kim L. Stearns, M.D. in April 2008.  (Tr. 352).  In a letter to Plaintiff's primary care physician, Dr. Stearns noted that Plaintiff had had conservative treatment with therapy but has persistent pain, swelling, and burning in his ankle.  (*Id.*).  Dr. Stearns noted that on examination Plaintiff had residual swelling in his ankle; he was tender over the distal fibula, Achilles and his medial malleolus; his range of motion was restricted about 25% in all planes; he had a negative anterior drawer; he had good capillary refill and there was no erythema but the skin is sensitive to light touch.  (*Id.*).  An x-ray showed a well-healed distal fibula fracture with some early degenerative changes in the ankle. (*Id.*).  An MRI was ordered.  She stated that surgery was not necessary unless the MRI were to show an osteochondral defect and that there would likely be no rehab issues with pain management.  (*Id.*).

In May 2008, Dr. Stearns reviewed the MRI of Plaintiff's left ankle, and, in a letter to Plaintiff's primary care physician noted that the MRI suggested an osteochondral lesion of the lateral talar dome that was not loose.  (Tr. 351).  Dr. Stearns recommended conservative treatment and an injection of Marcaine and Depomedrol.  (*Id.*).  If Plaintiff did not respond to that treatment, she suggested an arthroscopy with evaluation of the osteochondral lesion.  (*Id.*).

Plaintiff followed up with Dr. Stearns again in September 2008.  (Tr. 349).  Noting that he had no improvement after the injection, Dr. Stearns indicated that Plaintiff had a number of new symptoms relating to his foot.. (*Id.*).  Dr. Stearns stated that Plaintiff was not a surgical candidate at that time and recommended conservative treatment.  (*Id.*).  She stated that "I'm not sure that one specific surgery would make all his pain go away." (*Id.*).

In August 2009, Plaintiff had an initial consultation with podiatrist Dr. Kristina Kovach, DPM in relation to his injury.  (Tr. 514-515).  Plaintiff described his left foot and ankle pain as burning, tingling, sharp shooting pain which was aggravated with prolonged standing and walking.  (Tr. 515).  It was noted that physical therapy, injections, and medications including tramadol, gabapentin, and trileptal were unsuccessful in relieving his pain symptoms.  (*Id.*).  Physical examination of the left lower extremity demonstrated radiation with positive Tinel's sign.  (Tr. 514).

Plaintiff followed up with Dr. Kovach on February 9, 2010.  (Tr. 513).  He had weakness on examination, and severe pain was reproduced on palpation to the medial and lateral gutters of the ankle joint.  (*Id.*).  An MRI of the left ankle demonstrated abnormal hyperintensity within the lateral talar dome consistent with osteochondral lesion.  (*Id.*).  Dr. Kovach diagnosed reflex sympathetic dystrophy (RSD) and noted that most of Plaintiff's pain was related to that condition.  (*Id.*).  She anticipated he would have long-term damage and pain in the left ankle secondary to the osteochondral lesion.  (*Id.*).  Dr. Kovach recommended a custom AFO (ankle foot orthosis) brace for left foot and ankle support.  (*Id.*).  Plaintiff presented to Dr. Kovach in June 2011 for adjustment of his left foot brace.  (Tr. 509).  Dr. Kovach noted an excellent fit.

(*Id.*).  He reported intermittent improvement in pain, and he continued to have sharp, shooting pain and complete numbness in the left foot.  (*Id.*).

In April 2010, Plaintiff was referred to Cleveland Back and Pain Management for an evaluation for an implantation of a spinal cord stimulator.  (Tr. 358).  Dr. John Nickels, M.D. noted significant injury to the left ankle which was causing pain down the entire left leg, into his back.  (*Id.*).  Physical examination revealed a healthy male, slow to rise from a chair with a slow gait, decreased lumbar range of motion in flexion, extension, rotation and side bending, and decreased left ankle range of motion.  (Tr. 359).  Plaintiff was unable to perform duck walks, heel walks, toe walks, or squats on the left side due to severe pain.  (*Id.*).  He also had a positive straight leg raise on the left.  (*Id.*).

In November 2010, Plaintiff presented to Dr. Deepak Raheja, MD, also of Cleveland Back and Pain Management Center.  (Tr. 355-56).  Plaintiff reported pain, discomfort, and weakness in his right leg, and he complained of difficulty with weight bearing and taking steps. (Tr. 355).  Dr. Raheja noted 5/5 strength in both upper and right lower extremities and grade 4-/5 in the right distal foreleg, along with weakness of dorsiflexion and plantar flexion movements of the left ankle.  (Tr. 356).  It was recommended that Plaintiff avoid strenuous physical activities including lifting, pushing, and pulling.  (*Id.*).  He was advised to maintain the use of his back brace as frequently as possible, and he was also advised to use a walking cane as needed for assisted ambulation.  (*Id.*).  An MRI of the lumbar spine performed on November 16, 2010 revealed disc herniation at L1-L2, and L4-L5.  (Tr. 367-368).

Plaintiff presented to chiropractor Brian Bennett, D.C., in November 2010, complaining of pain with normal activities such as standing, lifting, sitting, and walking.  (Tr. 395).  Plaintiff

also reported difficulty with general personal care, obtaining restful sleep, and engaging in recreational activities.  (*Id.*).  Dr. Bennett noted that the brace prescribed by Dr. Kovach had been adjusted several times but still caused pain in the left foot and ankle.  (*Id.*).  Dr. Bennett stated that weight bearing on the left leg remained painful and difficult, as Plaintiff had an osteochondral defect that could not be repaired due to the nature of his RSD.  (*Id.*).  On examination, Dr. Bennett observed discoloration of a reddish splotchy pattern along both lower extremities.  (Tr. 396).  Plaintiff remained highly sensitive to light touch through the entire left leg and foot.  (*Id.*).  Passive range of motion of the ankle caused severe pain throughout the foot and ankle with reduced overall movement in all plains.  (*Id.*).  Lower back pain was reproduced with supine straight legs raise testing bilaterally.  (*Id.*).

After a follow-up visit in March 2011, Plaintiff reported pain, burning and tingling, as well as restricted range of motion through the left ankle and left knee.  (Tr. 389-90).  Plaintiff reported that RSD symptoms in his left lower extremity seemed to be spreading upward into his back and even into his neck and face.  (Tr. 389).  Upon examination, Dr. Bennett noted Plaintiff had an antalgic gait and difficulty changing positions.  (*Id.*).  Plaintiff's left lower extremity examination revealed hypersensitivity throughout the entire left leg with findings consistent with that of RSD.  (Tr. 390).  An assessment of Plaintiff's lumbar spine revealed positive Kemp's test bilaterally and positive straight leg raises bilaterally with referred pain into each hip/leg, greater on the left.  (*Id.*).  Dr. Bennett noted that Plaintiff continued to have weakness through the left foot secondary to his multiple injuries and development of RSD.  (*Id.*).

In April 2011, Plaintiff presented to neurologist Dr. William Bauer, M.D. with chief complaints of RSD of the lower extremities and chronic low blood pressure.  (Tr. 502).

6

Plaintiff was seen by Dr. John Collis, M.D., in September 2011 with complaints of chronic lower back pain with bilateral leg pain and tingling, worse on the left.  (Tr. 519). Plaintiff reported his symptoms were made worse with sitting, standing, walking, lying down, squatting, coughing, or sneezing.  (*Id.*).  Additionally, his legs felt heavy and weak, and he had difficulty sleeping due to the pain.  (*Id.*).  Dr. Collis concluded that Plaintiff had a severe L4-5 stenosis precipitated by his work injury and resulting in an abnormal state.  (Tr. 520).

On May 23, 2012, Plaintiff was seen by Dr. Raheja for a neurological follow up visit. (Tr. 768).  Plaintiff reported mid and lower back pain of moderate to severe intensity with radiation to the lower extremities accompanied with paresthesias.  (Tr. 768).  Plaintiff's gait was antalgic, and he walked with a limp on the left side.  (Tr. 769).

On July 9, 2012, Plaintiff reported difficulty ambulating at times.  (Tr. 766).  On examination Dr. Raheja noted muscle/bulk tone was preserved in the upoer and lower extremities; there was hypoesthesia present in the left distal foreleg, ankle, and foot; and muscle spasm and tenderness were present in the lower lumbar region with positive straight leg raises bilaterally.  (Tr. 767).  As of September 2012, Plaintiff reported lower back pain, which he described as a dull constant ache, which radiated to his lower extremities.  (*Id.*).  He also reported worsening pain symptoms in the right leg including paresthesias and dysesthesia in the right foreleg.  (Tr. 762).  Plaintiff reported difficulty getting off the couch due to bilateral leg weakness.  (*Id.*).  Dr Raheja recommended a walking cane *pro re nata* (as needed) for assisted ambulation at all times.  (Tr. 763).

In October 2012, Plaintiff presented to the hospital emergently with complaints of weakness, poor coordination, slurred speech, and ataxia.  (Tr. 691).  A CT of the brain revealed a

7

frontal mass with vasogenic edema.  (Tr. 697).  Plaintiff was diagnosed with a left frontal brain abscess and underwent a left needle biopsy and aspiration on October 10, 2012.  (Tr. 973). Plaintiff received IV antibiotics for eight weeks and participated in inpatient rehabilitation due to his impaired mobility, difficulties with ADL's, and speech and expression impairments.  (Tr. 732).  At an occupational therapy follow up visit on November 13, 2012, Plaintiff continued to experience right sided weakness.  (Tr. 959). In March 2013, he was experiencing right sided weakness, balance problems, and a decline in his memory (Tr. 1015).

At the request of the state agency, Plaintiff underwent a physical consultative examination on May 10, 2013.  (Tr. 1027).  Plaintiff reported chronic left leg pain with radiation. (*Id.*).  His pain was aggravated by sitting or standing.  (*Id.*).  The examiner opined that Plaintiff could perform light work and that he was able to sit eight hours per day; walk eight hours per day; ambulate without an assistive device; lift and carry ten (10) pounds frequently; lift and carry twenty (20) pounds occasionally; push, pull, and manipulate objects; operate hand and foot controlled devices; drive a motor vehicle and travel; and climb stairs. (Tr. 1030).

On October 16, 2013, Plaintiff established care with primary care physician Mirela Siscu, M.D.  (Tr. 1036).  On physical examination, Dr. Siscu noted pain to palpation in the lumbar spine and hyperesthesia in the left lower extremity.  (Tr. 1037).  An x-ray of the lumbar spine demonstrated degenerative disc changes at L1-L2 with moderate narrowing of the disc space. (Tr. 1040).

At a pain management follow up visit on October 29, 2013, Plaintiff reported weakness and numbness in the bilateral lower extremities.  (Tr. 1145).  Bending his left elbow caused forearm weakness.  (*Id.*).  On examination, there was tenderness to palpation on the lumbar

spine.  (*Id.*).  There was decreased sensation of the bilateral upper and lower thighs, and positive straight leg raising bilaterally.  (*Id.*).

In June 2014, Plaintiff was seen by a physician's assistant.  (Tr. 1120).  He reported pain in the left shoulder, dorsal spine, and low back.  (Tr. 1120).  It was also noted that Plaintiff was unable to afford an MRI of the lumbar spine at that time.  (*Id.*).  On September 17, 2014, Plaintiff reported right groin and hip pain.  (Tr. 1110).  He continued to have pain in the right shoulder with radiation to the top of the arm and back into the shoulder.  (Tr. 1111).  Plaintiff experienced limited range of motion in the lumbar and cervical spine, antalgic gait, and positive straight leg raising bilaterally.  (Tr. 1100-1117).

### 2.      Mental Impairments

Plaintiff received treatment for depression from Dr. Richard Barnett, Ph.D.  (Tr. 383).  At an initial psychological evaluation on March 13, 2009, Plaintiff reported that symptoms of depression began in January 2009, and were related to his chronic pain.  (Tr. 383). He reported that he did not meet with friends, was not involved in church or any community groups, and did not have any hobbies.  (Tr. 385).  He felt depressed and angry most of the time. Plaintiff verbally lashed out to express his anger, and had begun to experience tearful episodes.  (*Id.*).  The examiner diagnosed Depressive Disorder, NOS as evidenced by Plaintiff's clinically significant depressed mood.  (Tr. 386).

On March 18, 2009, Plaintiff saw psychologist Raymond D. Richetta, Ph.D. for a psychological evaluation, telling him he felt depressed and hopeless after his work injury.  (Tr. 420).  Dr. Richetta wrote that Plaintiff "has been laid off for about a month due to lack of work, not physical or psychological consequences of the claim."  (Tr. 416).  Claimant reported that Dr.

Krebs "was the initial treating physician." (Tr. 417).  After an MRI, Dr. Krebs told Plaintiff "there was nothing surgically he could do ... He later saw Dr. Sterns [sic] who also did not recommend surgery." (*Id.*).

On December 23, 2009, Plaintiff was again seen Dr. Richetta.  (Tr. 422).  Plaintiff reported that he would be rehired when work improved, but he had found out he had been replaced.  Plaintiff stated that he drives a stick shift which aggravates his foot pain.  (Tr. 422).

A treatment summary from June 2010 noted reduced concentration due to pain and agitation, slow task completion, loss of interest in things, and poor motivation.  Regarding adaptation to stress/work stability, Plaintiff was experiencing anger outbursts, insecurity, and responded to stress by becoming irritable and withdrawing.  (Tr. 373).  Plaintiff continued to attend therapy on a regular basis, and benefitted from twice a month individual counseling.  (*Id.*). As of September 2010, Plaintiff symptoms remained unchanged and included irritability, sadness, insomnia, frustration, pain and poor concentration.  (Tr. 461).

In August 2011, it was noted that Plaintiff had withdrawn from most of his friends.  He found that it took all his energy to manage his pain, and was getting little enjoyment from anything in his life.  (Tr. 551).  In October 2011, Plaintiff reported that he stayed home most of the time, and did not participate in any social activities.  (Tr. 561).  Based on his limited progress, Dr. Barnett referred Plaintiff to Dr. Byong Ahn, MD for medication management.  On October 10, 2011, Plaintiff presented to Dr. Ahn as very irritable and nervous.  He was started back on Depakote and Zoloft.  (Tr. 577).

In January 2012, Dr. Barnett again noted reduced concentration due to pain, agitation, slow task completion, loss of interest, and poor motivation.  (Tr. 594).  Regarding adaptation to

stress, Plaintiff continued to experience anger outbursts and significant insecurity.  He continued

to respond to stress by becoming irritable and withdrawing.  (Tr. 594).  While Dr. Barnett noted

some progress in Plaintiff's depressed mood, he concluded that he would have difficulty

functioning in an employment setting.  (*Id.*).  Plaintiff participated in monthly counseling with

Dr. Barnett through 2012.  (Tr. 620-685).

On March 26, 2013, Plaintiff underwent a psychological consultative examination

performed by Dr. Thomas Zeck, PhD.  He presented with a flat affect and depressed mood.  (Tr.

1017).  Administration of the WAIS-IV revealed a Full Scale IQ of 75, placing him in the

borderline range of intelligence.  (Tr. 1019).  Dr. Zeck diagnosed Major Depressive Disorder and

Borderline Intellectual Functioning, and opined that the combination of Plaintiff's depressive

symptoms and pain would limit his ability to maintain attention and concentration to perform

tasks, and to work with persistence at an adequate pace.  Dr. Zeck concluded that Plaintiff's

physical conditions would limit his ability to be gainfully employed at that time.  (Tr.

1020-1021).

**C.     Hearing Testimony**

During the January 28, 2015 hearing, Plaintiff testified to the following:

- He stated that he experienced pain in his back, leg, ankle, hips and right
  shoulder (Tr. 52).  He rated this pain as 7-1/2 out of 10.  (Tr. 54).  He testified
  that his physician recommended a pain pump to treat this pain, but that he was
  not "mentally stable enough" to undergo this treatment.  (Tr. 53-54).

- He stated that he was unable to afford physical therapy or additional treatment
  for his chronic leg and back pain.  (Tr. 52, 55, 67).  He testified that he cannot
  afford a knee or back brace.  (Tr. 68-69).

- He further testified that it takes him two days to mow his lawn because of this
  pain.  Plaintiff stated that he is able to stand for fifteen minutes at a time, walk
  for fifteen minutes at a time, and sit for twenty minutes.  (Tr. 56, 58).  Plaintiff

11

testified that his girlfriend performs most of the household chores, including laundry and cooking, and does all of the shopping.  (Tr. 63).

- He also testified that his right hand is "tingly" and he has difficulty using his right upper extremity due to weakness, and cannot grasp, or hold onto things. (Tr. 57).  Plaintiff described the pain in his left leg as burning and tingling, and that it swells and turns "black and blue.  (Tr. 64).

- Plaintiff stated that, although recommended by his physicians, he does not use a cane or walker to ambulate because he does not feel comfortable using these devices in public, because he does not want people to know that he is "messed up."  (Tr. 65).

The VE testified Plaintiff had past work as a dump truck driver, tractor trailer driver, and cement mason.  (Tr. 70-71).  The ALJ then posed the following hypothetical question:

> If you could please assume a hypothetical individual of the claimant's age and education with the past jobs that you described, and further assume that this individual is limited to a range of light work, specifically occasionally lifting and carrying 20 pounds, frequently lifting and carrying ten pounds, sitting, standing and walking up to six hours in a workday, and push and pull as much as he can lift and carry.
>
> Further, frequent climbing ramps and stairs, never climbing ladders and scaffolds, and occasional kneel, crouch, crawl, never at unprotected heights, and fur.ther, limited to perform simple, routine, and repetitive tasks, but not at a production rate pace, with occasional interaction with supervisors, coworkers, and the public.

(Tr. 72).  The VE testified that such a hypothetical individual would be unable to perform plaintiff's past relevant work.  (*Id.*).  However, the VE stated that this hypothetical individual would be able to perform the jobs of cleaner, marker, and mail clerk.  (Tr. 72-73).

The ALJ posed a second hypothetical which included all the postural, environmental, and mental limitations of the first hypothetical, but the second hypothetical individual was limited to a range of sedentary work.  (Tr. 73).  The ALJ included the additional limitation that the individual never be exposed to extreme cold.  (*Id.*).

12

The VE testified that the second hypothetical individual would be unable to perform Plaintiff's past relevant work, but the second individual would be able to perform other representative jobs in the economy, such as addresser, document preparer, and film touch-up inspector.  (Tr. 74).

In the third hypothetical, the ALJ assumed all limitations from hypothetical two with additional limitations of no left foot controls, only occasional right overhead reaching, and frequent right handling and fingering, and occasional right feeling.  (Tr. 74-75).

The VE testified that even with the added limitations the hypothetical individual would still be able to perform such as addresser, document preparer, and film touch-up inspector.  (Tr. 76).

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923

13

(6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31,2013.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 3, 2008 through his date last insured of December 31, 2013 (20 CFR 404.1571et seq.).

3. Through the date last insured, the claimant had the following severe impairments: brain abscess, reflex sympathetic dystrophy (RSD) of the left lower extremity, lateral talar dome osteochondral lesion, degenerative disc

14

disease of the lumbar spine, borderline intellectual functioning, and depressive disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), as the claimant could lift and/or carry 10 pounds occasionally; stand and/or walk for 2 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday. The claimant could only frequently climb ramps and stairs and never climb ladders and scaffolds. The claimant could occasionally kneel, crouch and crawl. The claimant could never operate any left foot controls. The claimant could only occasionally conduct right overhead reaching, occasionally conduct right feeling, and frequently conduct right handling and fingering. In addition, the claimant was restricted from unprotected heights and extreme cold. In addition, the claimant was limited to simple, routine and repetitive tasks that were not conducted at a production rate pace (e.g. assembly line work). The claimant could respond appropriately to supervisors, coworkers and the public occasionally.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 3, 1973 and was 40 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from December 3, 2008, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr. 18-27).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence

16

could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

//

//

//

//

17

## VI.  ANALYSIS

**A.       First Assignment of Error:Whether Plaintiff's impairment meets Listing 1.02**

Plaintiff argues that the ALJ erred by failing to adequately evaluate his impairments at step-three of the sequential analysis.  In particular, Plaintiff asserts that his diagnosis of reflex sympathetic dystrophy of his left leg and ankle meets Listing 1.02.

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§

18

404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds*, 424 F. App'x at 414-15. In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *See id.* at 416-17.

Here, Plaintiff's challenge to the ALJ's step-three analysis is limited whether Plaintiff met Listing 1.02 Major dysfunction of a joint. Listing 1.02 requires a claimant to have major dysfunction of a joint

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. § 404, Subpt. P, App. 1.

In this case, the ALJ concluded that Plaintiff did not meet each and every element on Listing 1.02, reasoning as follows:

> The claimant does not meet Listing 1.02. MRI scans of the claimant's left foot dated August 19, 2009 showed no evidence of fracture, mild osteochondritis in the lateral talar dome, and evidence of a former injury (5F 2-3). MRI scans of the lumbar spine taken on October 27, 2010 found no evidence of fracture or spondylolisthesis, indicating that the claimant's lumbar spine was normal (5F 9). This was consistent with the MRI scan of the claimant's spine on November 16, 2010, which showed herniated discs at L1 -2 and L4-5 (5F 7-8). There is evidence that the claimant does have an antalgic gait, but

19

there is no evidence that it significantly affects the claimant's ability to ambulate effectively.  One of the claimant's treating providers recommended in November 2010 that he could use a walking cane, if needed (4F 2).  However, while the claimant's representative testified that the claimant could use a walker, the claimant stated that he does not require the use of a cane or a walker (Hearing Testimony).  Therefore, the claimant's medical records do not show evidence of major dysfunction and chronic pain involving at least one major weight-bearing joint resulting in an inability to ambulate effectively.  In addition, the claimant's medical records show no evidence of a compromised nerve root, no record of positive straight-leg raising tests, spinal arachnoiditis resulting in the need to change position or posture more than once every two hours, or lumbar spinal stenosis resulting in pseudoclaudication and an inability to ambulate effectively as required by listing 1.04. See 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520( d), 404.1525 and 404.1526).  As such, the undersigned finds that the claimant does not meet or medically equal any 1.00 listing for the musculoskeletal system.

(Tr. 19).

The ALJ considered the severity of Plaintiff's impairment at step-three and appropriately determined that Plaintiff did not meet each and every element of Listing 1.02.  One of the necessary elements of Listing 1.02 is an "inability to ambulate effectively."  20 C.F.R. § 404, Subpt. P, App. 1.  An "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk." *Id.* § 1.00B2b(1).  As explained in the regulations, an individual cannot ambulate effectively if, for example, he is unable to walk "without the use of a walker, two crutches[,] or two canes" or "carry out routine ambulatory activities, such as shopping and banking."  *Id.* § 1.00B2b(2).  In this case, the ALJ's factual findings support the conclusion that Plaintiff could "ambulate effectively" for most of the relevant period.  Specifically, based on Plaintiff's own testimony, the ALJ found that Plaintiff was able to walk without a cane most of the time.  (Tr. 19, 65).  During the hearing, when the ALJ asked, "so you walk without a cane most of the time?" Plaintiff answered "yes."  (Tr. 19, 65).  The ALJ further noted that Plaintiff's physician Dr. Raheja advised that Plaintiff use a walking cane *as needed* for assisted ambulation.

20

(Tr. 19).  The ALJ, while recognizing that Plaintiff had a mild restriction in his activities, also noted that Plaintiff was able to take care of his person[al] needs and care for a household pet. (*Id.*).  There is also evidence that Plaintiff assisted his girlfriend with taking care of her mother and grandson.  (*Id.*).

In addition, Plaintiff fails to demonstrate how he meets the various other necessary elements of Listing 1.02.  For instance, Plaintiff cites no evidence to show that he suffers from a "gross anatomical deformity," "stiffness," or "joint space narrowing, bony destruction, or ankylosis of the affected joint."

The evidence cited by the ALJ amounts to substantial evidence supporting the conclusion that Plaintiff's impairments did not meet or equal Listing 1.02.  Therefore, Plaintiff's first assignment of error has no merit.

//

//

//

//

//

//

//

//

//

//

//

21

**B.**     **Second Assignment of Error: Whether the ALJ erred in assessing Plaintiff's credibility**

In his second assignment of error, Plaintiff maintains that the ALJ failed to properly evaluate his credibility.[2]  It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR16-3p, 2016 WL 1119029 (Mar. 16, 2016).[3]

---

[2]        Plaintiff erroneously characterizes his second assignment of error as an error at step five of the sequential evaluation.  Specifically, Plaintiff asserts that the ALJ erred at step five by improperly evaluating Plaintiff's credibility and concluding that Plaintiff is capable of sedentary work.  However, under the regulations the determination of what a claimant is capable of despite his limitations (i.e. his residual functional capacity) occurs at step four, not at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("Step Four 'necessarily entails a comparison of the physical demands of the claimant's past relevant work with [his] present mental and physical capacity.'") (quoting *Veal v. Bowen*, 833 F.2d 693, 697 (7th Cir.1987)).  The Court accordingly treats Plaintiff's second assignment of error as a challenge to the ALJ's credibility findings at step four, not step five.

[3]        Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016), supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the January 28, 2015 hearing.   While there is not the unanimity on the issue, this Court applies SSR 16-3p retroactively as it agrees with the rationale of another district court that has addressed the issue.  *See Mendenhall v. Colvin*, No. 3:14-CV-3389, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) ("where new rules merely clarify unsettled or confusing areas of the law, retroactive application is proper" and finding that "SSR 96-7p and SSR 16-3p are substantially similar"); *accord Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666 at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly

22

Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96–7p, Purpose section, 1996 WL

---

semantic."); *contra Murphy v. Comm'r of Soc. Sec.*, No. 1:15-CV-126-SKL, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively).

374186 (July 2, 1996); see also *Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  See SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

In this case, the ALJ properly evaluated the Plaintiff's subjective complaints of pain and cited specific evidence from the record which, taken as a whole, reasonably undermines Plaintiff's claims of disabling pain.  For instance, the ALJ noted the following:

- Plaintiff's treating physicians did not consider him a candidate for surgery in September 2008.  (Tr. 349).

- His treating physician recommended conservative treatment (use of an ankle brace and steroid injections) but not physical therapy or surgery.  (Tr. 398).

---

[4]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

24

- His physician recommended use a cane as needed for ambulation, but Plaintiff walked without a cane most of the time.  (Tr. 65).

- Plaintiff experienced "immediate improvement" with his new back brace (Tr. 510)

- Plaintiff was not taking any pain medications, and he was not following up with any physician for his injury.  (Tr. 1027)

- An x-ray of Plaintiff's lumbar spine was normal, showing no evidence of fracture or spondylolisthesis.  (Tr. 369).

- A course of passive noninvasive care for his back pain improved his range of motion.

- Plaintiff's chiropractor recommended increase in the frequency of treatment, as Plaintiff was doing "much better with a higher frequency of treatment"  (Tr. 392).

- Plaintiff stated that he was able to drive a stick shift car.  (Tr. 422).

- Plaintiff was able to fill out a lengthy handwritten function report.  (Tr. 309-317).

- As of March 18, 2009, Plaintiff had refused to seek medical treatment for over three months.  (Tr. 417).

- A consultative examiner noted that Plaintiff walked with a normal gait and did not need an ambulatory aid.  (Tr. 1029).

- Plaintiff reported to Dr. Bennett that he used his leg brace on a regular basis and did not report any problems.  (Tr. 390).  However, he told another provider that his brace was too painful to wear.  (Tr. 376, 442).

- Plaintiff had mild restriction in activities of daily living.  (Tr. 19).  He was able to take care of his personal needs.  He cared for a household pet.  He assisted his significant other in taking care of her mother and her grandson.  (Tr. 19).

In light of the above, the ALJ concluded that "claimant's medically determinable impairments

could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible . . . ."  (Tr. 24).

The Court disagrees with Plaintiff's assertion that in assessing Plaintiff's credibility the

ALJ provided "a cursory analysis of the medical evidence, extracting only citations that support

her ultimate conclusion."  (Doc. No. 17 at 17).  Review of the ALJ's decision as a whole reveals

that the ALJ considered all the relevant evidence and properly considered "all of [Plaintiff's]

medically determinable impairments, both individually and in combination," S.S.R. 96-8p.  The

ALJ reviewed and discussed Plaintiff's RSD diagnosis and its associated symptoms, Plaintiff's

herniated discs, stenosis, his brain abscess, and his depression.  (Tr. 22).  Plaintiff fails to

convincingly demonstrate that the ALJ improperly "cherry-picked" the record.  *DeLong v.*

*Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (a "cherry-picking" argument "is

seldom successful because crediting it would require a court to re-weigh record evidence.")

(citing *White*, 572 F.3d at 284).  Moreover, in fashioning Plaintiff's residual functional capacity,

the ALJ acknowledged and accommodated Plaintiff's various limitations, restricting Plaintiff to

sedentary work, precluding the use of foot controls, and limiting reaching and feeling.  In

addition, the ALJ limited Plaintiff to simple, routine, and repetitive tasks that were not conducted

at a production rate pace.

Plaintiff also takes issue with some of the evidence cited by the ALJ in judging

Plaintiff's credibility.  Plaintiff first claims that the ALJ improperly relied on his physician's

conclusion that Plaintiff was not a candidate for surgery.  Plaintiff asserts that the ALJ failed to

point out that the reason surgery was inadvisable was because it could significantly worsen his

RSD.  (Doc. No. 17 at 17).  The Court's review of the evidence shows that Plaintiff's assertion is

incorrect.  Dr. Stearns did not, as Plaintiff claims, state that surgery was inadvisable due to the risk of worsening Plaintiff's RSD.  Rather, Dr. Stearns stated that surgery was unlikely to improve his symptoms.  (Tr. 349).  On the other hand, the Commissioner does not fully explain how the fact that Plaintiff was not a surgery candidate bears on his credibility.  The implication seems to be that his non-candidacy for surgery tends to show that Plaintiff's condition was not severe.  However, the Commissioner cites no authority to support the idea that non-candidacy for surgery necessarily implies a less severe medical condition.  In any event, while the Court finds the ALJ's justification questionable, it does not amount to reversible error because, as described above, the ALJ cited to other evidence that reasonably supported his credibility determination.

Next, Plaintiff argues that the ALJ failed to properly consider his ability to drive a stick shift in context, noting that while he did report to his psychologist that he could still drive a stick shift, he also complained that it aggravates his foot pain.  (Tr. 422).  While the Court agrees with Plaintiff that the ALJ could have been more forthcoming in discussing this evidence, as she did not mention that driving a stick shift aggravated Plaintiff's pain, it was not improper for the ALJ support her credibility assessment based on Plaintiff's continued ability to drive a stick shift.  Even though Plaintiff's foot pain may have been aggravated by driving, the fact that he nonetheless continued to drive reasonably supports the conclusion that Plaintiff's pain was not as severe as he claimed.  The ALJ did not error in this regard.

Plaintiff challenges the ALJ's finding that Plaintiff was capable of performing fine and gross manipulation on a continuous basis based on the fact that Plaintiff was able to fill out a lengthy handwritten form.  First, it is not evident that the ALJ made the specific finding Plaintiff claims she did, as she stated that Plaintiff's "lengthy, handwritten function report indicates that

27

the *claimant was capable of fingering sufficiently to communicate as needed*."  (Tr. 24).  In addition, even if the Court were to accept that Plaintiff's ability to fill out a form was an improper basis for concluding that he was capable of performing fine and gross manipulation on a continuous basis, Plaintiff cites no medical or opinion evidence to support his claim that he suffered from any manipulative impairment.  As pointed out by the Commissioner, there is ample evidence to show he did not.  (Tr. 91, 99-100, 107, 125, 129, 1030-31).

Plaintiff also maintains that the ALJ improperly considered conflicting evidence relating to Plaintiff's use of a knee brace.  The ALJ reasoned that

> while the claimant consistently complained to Dr. Bennet that he was unable to use a knee brace (8F|27, 6F) records from Dr. Bennet indicate that the claimant told his physician that he was utilizing his brace on a regular basis, and did not indicate that the brace caused any problems (7F|4).

Plaintiff suggests the discussion relating to Plaintiff's use of a knee brace is irrelevant to the credibility analysis.  However, Plaintiff cites no authority to support this idea.  The ALJ's discussion regarding conflicting evidence was not improper.  "Consistency of the various pieces of information contained in the record should be scrutinized.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."  *Rogers*, 486 F.3d at 247-48.

Finally, Plaintiff contends that the ALJ failed to acknowledge that his treating sources have consistently provided objective evidence to substantiate his subjective complaints; and have consistently reported that he has difficulty ambulating and performing activities of daily living.  The Court disagrees.  As discussed above, it is evident that the ALJ considered Plaintiff's medically determinable impairments, both individually and in combination.  Further, the ALJ

acknowledged and gave some credence to Plaintiff's subjective complaints.  Plaintiff's difficulty

ambulating and his difficulties with performing activities of daily living were reasonably

accommodated by the assigned sedentary residual functional capacity.

In sum, Plaintiff's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

_s/ Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 2, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**